**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CATALYST CONSULTING GROUP, INC., | ) | |
| | ) | |
| Plaintiff/Counter-Defendant, | ) | No. 25-cv-4289 |
| | ) | |
| v. | ) | Judge April M. Perry |
| | ) | |
| TIMOTHY SMITH and NICOLE SMITH, | ) | Magistrate Judge M. David Weisman |
| | ) | |
| Defendants, | ) | JURY TRIAL DEMANDED |
| | ) | |
| TIMOTHY SMITH, | ) | |
| | ) | |
| Defendant/Counter-Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CATALYST CONSULTING GROUP, INC., | ) | |
| ARVIN K. TALWAR, and CINDY | ) | |
| TALWAR, | ) | |
| | ) | |
| Counter-Defendants. | ) | |

**DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES TO THE AMENDED
COMPLAINT, AND DEFENDANT TIMOTHY SMITH'S COUNTERCLAIM**

Defendants Timothy Smith ("Tim") and Nicole Smith ("Nikki"), by and through their

counsel, answer Plaintiff Catalyst Consulting Group, Inc.'s ("Catalyst") Amended Complaint

(Dkt. 40) as follows. This Answer responds to the Amended Complaint as narrowed by the

Court's July 2, 2026 Opinion and Order (Dkt. 69), which: (1) dismissed Count V; (2) struck

Paragraph 168 and held that Count IV states no ripe claim under Paragraphs 5 and 6 of the

Agreement, declining to opine on their enforceability, such that Count IV proceeds only under

Paragraphs 3 and 4 (Dkt. 69 at 6–7); and (3) left Count I dismissed as against Tim (Dkt. 17; Dkt.

40 at 16 n.1; Dkt. 69 at 11 n.6). No response is required to allegations offered solely in support

of the stricken Paragraph 168 or the unripe Paragraphs 5–6 theory; where a response is

1

nonetheless supplied, it is without waiver of that position. Any allegation not expressly admitted is denied.

## ANSWER

1.      Catalyst is an Illinois corporation with its primary place of business at 211 West Wacker Dr., Suite 450, Chicago, IL 60606.

**ANSWER:** Admitted.

2.      Nicole Smith is a citizen of Indiana who worked at Catalyst in Cook County, Illinois.

**ANSWER:** Admitted.

3.      Timothy Smith is a citizen of Indiana who worked at Catalyst in Cook County, Illinois. (Together with Nicole Smith, "the Smiths" or "Defendants").

**ANSWER:** Admitted.

4.      On April 11, 2025, Catalyst filed the original complaint for this action in the Circuit Court of Cook County, Illinois, case number 2025-CH-04094.

**ANSWER:** Admitted.

5.      Venue was proper before the Circuit Court for Cook County pursuant to 735 ILCS 5/2-101 of the Illinois Code of Civil Procedure, in that a substantial part of the events giving rise to the claims asserted herein occurred in Cook County, Illinois.

**ANSWER:** Paragraph 5 states a legal conclusion to which no response is required. To the extent a response is required, denied.

6.      On April 19, 2025, Defendants removed the action pursuant to 28 U.S.C. §§ 1332, 1441, and 1446 to the U.S. District Court for the Northern District of Illinois. See ECF 1. Catalyst did not oppose the removal.

**ANSWER:** Admitted.

2

7.      Jurisdiction before this Court is proper under 28 U.S.C. § 1332, as the parties are residents of different states and the amount of damages in controversy is in excess of $75,000.

**ANSWER:** Paragraph 7 states a legal conclusion to which no response is required. To the extent a response is required, denied. Defendants admit that this Court has subject-matter jurisdiction under 28 U.S.C. § 1332.

8.      On May 9, 2025, Defendants jointly moved to dismiss the Complaint, asserting, among other things, that the Court lacked personal jurisdiction over Defendants. See ECF 6. Catalyst opposed the motion. See ECF 8.

**ANSWER:** Defendants admit that on May 9, 2025 they jointly moved to dismiss the original Complaint and that the motion asserted, among other grounds, lack of personal jurisdiction. The motion speaks for itself; any characterization inconsistent with it is denied.

9.      On September 25, 2025, the Court denied Defendants' motion as to personal jurisdiction, finding that personal jurisdiction existed over Defendants because their employment relationship was with Catalyst, which is based in Illinois. See ECF Doc. 17 at 5-7.

**ANSWER:** The Court's September 25, 2025 Opinion and Order (Dkt. 17) speaks for itself. Defendants admit it was entered and deny any characterization inconsistent with its terms.

10.     Venue is proper before the Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred within the Court's judicial district. Facts

**ANSWER:** Paragraph 10 states a legal conclusion to which no response is required. To the extent a response is required, denied. Defendants admit that venue is proper in this District.

11.     Catalyst is a family-owned company that is certified as a Minority Business Enterprise ("MBE") and has been in business for almost 33 years.

**ANSWER:** Admitted on information and belief.

3

12.     Catalyst is a technology consulting and development company that serves its customers by providing customized technological services, such as customer relationship, case management, app development, and web design services, to help them better serve their own customers and constituents.

**ANSWER:** Admitted.

13.     Catalyst serves a variety of clients but has developed expertise in serving clients in the public sector, which makes up approximately 90% of its work.

**ANSWER:** Defendants admit that Catalyst serves a variety of clients and that public-sector clients make up a substantial portion of its work. Defendants lack knowledge as to the precise percentage, and the remaining allegations are denied.

14.     Catalyst operates primarily in the Chicago area but also does business across the United States and Canada.

**ANSWER:** Admitted.

15.     Over the course of its operations, Catalyst expended substantial effort and funds building a client base and in its talent acquisition efforts.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 15, which has the effect of a denial, and on that basis the allegations are denied.

16.     Catalyst takes measures to protect its clients' identities and information, not only to protect client confidentiality given the nature of the services provided, but also to protect its business interest in its clientele, which is an important asset of the business.

**ANSWER:** Denied.

17. Catalyst has an ongoing relationship with many of its clients, with projects often turning into sustained relationships with the clients.

**ANSWER:** Denied.

18. Likewise, over the course of its operations, Catalyst has expended substantial efforts and funds recruiting and developing talent and human capital in an industry where talent is critical to success, in short supply, and demands a unique set of skills.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 18, which has the effect of a denial, and on that basis the allegations are denied.

19. To protect these critical assets, Catalyst limits access to client and applicant information to those employees who need to know the information.

**ANSWER:** Denied.

20. In or around 2005, Timothy Smith was hired by Catalyst as a Network Engineer.

**ANSWER:** Admitted.

21. Over time, Mr. Smith was promoted to Project Manager, then Director of Infrastructure, and finally to the position of Managing Principal & Chief Operating Officer ("COO").

**ANSWER:** Admitted.

22. Throughout his time with Catalyst, Mr. Smith and Catalyst's leadership developed a close and trusted relationship.

**ANSWER:** Defendants admit that Tim served Catalyst for nearly twenty years and worked closely with its leadership. The remaining allegations are denied as characterization.

23. As Managing Principal and COO, Mr. Smith developed relationships with clients and had access to all client information and key internal company-confidential information.

**ANSWER:** Defendants admit that, as Managing Principal and COO, Tim developed relationships with certain Catalyst clients. Defendants deny that Tim had access to "all" client information and deny the remaining allegations.

24. Mr. Smith was well-compensated, receiving a high six-figure salary for his work.

**ANSWER:** Admitted.

25. With his promotion to Managing Principal and COO, Mr. Smith's compensation was adjusted to include phantom stock in the company. As phantom stock, Mr. Smith had no ownership interest, but a received a discretionary 12.5% quarterly bonus reflective of such an interest and tied to the company's profitability.

**ANSWER:** Denied as stated. Answering further, Defendants state that under Tim's 2019 compensation package (Catalyst0000061), Tim was entitled to a quarterly commission calculated as 12.5% of Catalyst's quarterly net income, payable in the month following each quarter, subject to a true-up by Catalyst's outside accountants. Defendants deny Paragraph 25's characterization of that compensation, including the label "phantom stock" and the assertion that it was discretionary in practice.

26. As part of the terms of Mr. Smith's bonus, should Catalyst undergo recapitalization and sale, Mr. Smith would receive 12.5% of the company's valuation.

**ANSWER:** Denied as stated. The 2019 compensation package (Catalyst0000061 ¶ 7) provided that, in the case of a re-capitalization of CCG in 2019, the parties would discuss Tim's participation in the re-cap equity value commensurate with his role. Defendants deny the remaining allegations of Paragraph 26.

27.     On March 7, 2005, Mr. Smith and Catalyst executed a contract entitled "Confidentiality, Non-Compete and Non-Disclosure Agreement" (referred to as the "Agreement"). A true and accurate copy of that executed agreement is attached hereto as Exhibit A ("Ex. A").

**ANSWER:**   Defendants admit that on or about March 7, 2005, Tim and Catalyst executed a document entitled "Confidentiality, Non-Compete and Non-Disclosure Agreement," a copy of which is attached to the Amended Complaint as Exhibit A.

28.     The Agreement is a valid contract.

**ANSWER:**  Paragraph 28 states a legal conclusion to which no response is required. To the extent a response is required, denied.

29.     Catalyst performed all conditions precedent to recovery under the Agreement.

**ANSWER:**  Denied. Pursuant to Federal Rule of Civil Procedure 9(c), Defendants deny with particularity that Catalyst performed all conditions precedent and all of its own obligations: among other things, Catalyst withheld Tim's earned quarterly commissions for at least the final two fiscal quarters of 2024 (Dkt. 40 ¶ 53; Catalyst0000003) and failed to pay acknowledged expense reimbursements (Catalyst0000049; Catalyst0000034), as set forth in the Counterclaim below.

30.     Paragraph 3 of the Agreement provides that: Employee agrees that he/she will not, directly or indirectly, during the course of his/her employment and twelve months thereafter upon termination of this employment for any reason whatsoever, divulge to any other person, firm or corporation, without Employer's consent any trade secrets or confidential and proprietary information acquired by employee by any means whatsoever during his/her employment by Employer, relating to or concerning any phase of Employer's or his/her customer's business or operations. (Ex. A at § 2).

7

**ANSWER:** The Agreement (Dkt. 40-1) is a written document that speaks for itself. Defendants admit that Paragraph 30 purports to quote from or characterize that document, deny any quotation or characterization inconsistent with the document's terms, and deny the remaining allegations of Paragraph 30.

31. The Agreement further provided that, during Mr. Smith's employment with Catalyst and for the twelve months following the termination of his employment, Mr. Smith would not: a. " . . . solicit the trade or patronage of any of the Employer's customers, suppliers, subcontractors or other Employees with whom the Employee has contact, and with whom Employer has actually engaged consultants or has had communication concerning the potential assignment of consultants." (Ex. A at § 4). b. " . . . directly or indirectly, individually, or as a partner, stockholder, director, officer, principal, agent, employee, or in any other capacity or relation, enter into any business or employment with past or current customers of Employer or any potential customers with whom the Employee has come into contact." (Ex. A at § 5). c. " . . . either directly or indirectly, accept employment with any Employer client." (Ex. A at § 6).

**ANSWER:** The Agreement (Dkt. 40-1) is a written document that speaks for itself. Defendants admit that Paragraph 31 purports to quote from or characterize that document, deny any quotation or characterization inconsistent with the document's terms, and deny the remaining allegations of Paragraph 31.

32. Nicole Smith is the wife of Timothy Smith.

**ANSWER:** Admitted.

33. Mrs. Smith was hired by Catalyst in or around August 2017 as a part-time contractor to assist her husband, who was then COO, and to provide recruitment and talent acquisition services for Catalyst.

**ANSWER:** Defendants admit that Nikki was engaged by Catalyst in or around August 2017 as a part-time independent contractor providing recruitment support. The remaining allegations are denied as characterization.

34. In or around January 2023, Mrs. Smith began a full-time position with Catalyst. Her role was expanded to include assisting Chief Revenue Officer Eric Talwar with proposals for prospective and current clients and recruitment/talent acquisition.

**ANSWER:** Defendants admit that in or around January 2023 Nikki became a full-time W-2 employee and that her role included assisting Chief Revenue Officer Eric Talwar with proposals. The remaining allegations are denied.

35. As part of her job responsibilities, Mrs. Smith provided prospective employees with Catalyst's Employee Handbook ("Handbook") and answered questions they had about it. A true and accurate copy of the 2023 Handbook is attached hereto as Exhibit B ("Ex. B").

**ANSWER:** Defendants admit that Nikki's responsibilities included providing prospective employees with Catalyst's Employee Handbook and answering questions about it. The remaining allegations are denied.

36. Mrs. Smith's job duties also resulted in Mrs. Smith serving as the liaison between talent acquisition and Catalyst's proposals. Mrs. Smith would identify the hiring needs for new proposals, evaluating the financial constraints of the proposals, and identifying the financial demands for hiring the various positions required for the proposed projects. Conducting this work required Mrs. Smith to have access to sensitive client and company information, as well as job applications.

9

**ANSWER:** Defendants admit that Nikki's duties included recruiting and identifying candidates in connection with Catalyst proposals. The remaining allegations are denied as characterization.

37. Mrs. Smith was compensated for her work and, as a full-time employee, even received a bonus for her work in 2024.

**ANSWER:** Admitted.

38. Notably, Mrs. Smith was asked to sign a "Confidentiality, Non-Compete and Non-Disclosure Agreement" with the same terms as that signed by her husband but consistently offered excuses for failing to do so.

**ANSWER:** Defendants admit that Nikki was asked to sign a "Confidentiality, Non-Compete and Non-Disclosure Agreement" and that she never signed one. Defendants deny the remaining allegations of Paragraph 38, including the characterization that she "consistently offered excuses."

39. Prior to starting employment with Catalyst, all employees must agree to abide by Catalyst's Employee Handbook as a condition of their employment at Catalyst. (Ex. B).

**ANSWER:** Denied.

40. Mr. and Mrs. Smith's verbally agreed to comply with the Handbook, which is a valid contract.

**ANSWER:** Denied.

41. Notably, both Smiths were also asked to sign acknowledgments of their agreement to abide by the 2023 Handbook's terms – and did so for a 2019 version of the Handbook. However, when asked to do so for the updated Handbook, the Smiths gave Catalyst the run-around. Neither

10

ever provided signed acknowledgments of the updated Handbook. The version of the Handbook provided in Ex. B is that verbally agreed to by the Smiths in 2023.

**ANSWER:** Defendants admit that they signed acknowledgments concerning a 2019 version of the Employee Handbook. Defendants deny the remaining allegations of Paragraph 41.

42. In part, the Handbook contains a "Moonlighting" provision, which provides that: Work-related activities and conduct away from Catalyst must not compete with, conflict with or compromise the company's interests or adversely affect job performance and the ability to fulfill all responsibilities to Catalyst. Employees are prohibited from performing any services for customers/clients of Catalyst that are normally performed by Catalyst. This prohibition also extends to the unauthorized use of any company tools or equipment and the unauthorized use or application of any company confidential information. In addition, employees may not solicit or conduct any outside business during work time for Catalyst. (Ex. B at 22).

**ANSWER:** The 2023 Employee Handbook (Dkt. 40-2) is a written document that speaks for itself. Defendants admit that Paragraph 42 purports to quote from or characterize that document, deny any quotation or characterization inconsistent with the document's terms, and deny the remaining allegations of Paragraph 42.

43. The Handbook further provides that employees are not allowed to: [D]irectly or indirectly divulge to or discuss with third parties (i) any trade secret, system, program, or any other matter on which you are working, (ii) any other program, system, or work products belonging to Catalyst and/or Catalyst's customers which are disclosed to or learned by you, (iii) any information regarding Catalyst and any agreements of contracts Catalyst has or may have with any other company, agency or firm; or (iv) any other trade secrets or confidential and proprietary information you acquired, learned or developed by any means whatsoever during your

11

employment by Catalyst, relating to or concerning any phase of Catalyst's or its customer's business or operations. (Ex. B at 25).

**ANSWER:** The 2023 Employee Handbook (Dkt. 40-2) is a written document that speaks for itself. Defendants admit that Paragraph 43 purports to quote from or characterize that document, deny any quotation or characterization inconsistent with the document's terms, and deny the remaining allegations of Paragraph 43.

44. In or around late 2023, Catalyst's leadership considered proposals for the sale or acquisition of the company. By April and May 2024, Catalyst's leadership was in serious negotiations with three potential investment groups.

**ANSWER:** Defendants admit that in or around late 2023 Catalyst's leadership considered proposals for a sale or acquisition of the company and that negotiations followed in 2024. Defendants lack knowledge or information sufficient to form a belief as to the precise number of potential investment groups, and the remaining allegations are denied.

45. As part of these negotiations, Catalyst's valuation was calculated, including Mr. Smith's potential share of any the proposed sales/acquisition price according to the terms of his phantom stock bonus.

**ANSWER:** Defendants admit that in connection with the contemplated transaction Catalyst's valuation was calculated and that Tim's potential share of proposed sale proceeds was discussed. The remaining allegations are denied.

46. In or around late May 2024, however, Catalyst's Managing Principal and CEO, Arvin Talwar determined that Catalyst should remain independent and a sale or acquisition would not go forward.

**ANSWER:** Admitted.

12

47.     Subsequently, Mr. Smith was informed of the CEO's decision.

**ANSWER:** Admitted.

48.     For the remaining months of 2024, Mr. Smith's job performance declined.

**ANSWER:** Denied.

49.     Upon information and belief, Mr. Smith "quiet quit." Mr. Smith began working less and his job performance began to suffer.

**ANSWER:** Denied.

50.     Catalyst expended significant funds and resources to mends the client relationships harmed by Mr. Smith's conduct.

**ANSWER:** Denied.

51.     For example, the services and deliverables provided to the City of Chicago's Department of Law during this time were unsatisfactory due to Mr. Smith's failures. Arvin Talwar was told by a representative of the City of Chicago's Department of Law that they no longer wanted to work with Mr. Smith and that the Department of Law would not be paying for the time and resources Catalyst would expend to correct the work.

**ANSWER:** Denied.

52.     Upon information and belief, Mr. Smith's failure, specifically as to the Department of Law, cost Catalyst approximately $500,000 in labor costs to correct the issues and preserve the client relationship.

**ANSWER:** Denied.

53.     Due to Mr. Smith's performance issues, during the last two fiscal quarters of 2024, Arvin Talwar determined that Mr. Smith would not be receiving his discretionary phantom stock bonus.

**ANSWER:** Defendants admit that Arvin Talwar determined that Tim would not receive his quarterly commission for the final two fiscal quarters of 2024 and that Catalyst did not pay it (Catalyst0000003). Defendants deny that the commission was discretionary, deny that any performance issue existed or justified the withholding, and deny the remaining allegations of Paragraph 53.

54. Upon information and belief, on learning that the sale of Catalyst would not go forward, Mr. Smith knew he was intending to quit and neglected his job while contentedly accepting his substantial six-figure salary.

**ANSWER:** Denied.

55. Upon information and belief, in the latter half of 2024, Mr. Smith contacted Travis Bloomfield of Provisio Partners Illinois, LTD. ("Provisio").

**ANSWER:** Defendants admit that in the latter half of 2024 Tim communicated with Travis Bloomfield of Provisio Partners Illinois, Ltd. The remaining allegations are denied.

56. Provisio provides similar technology services to businesses and government agencies, mainly in the Chicago area, and it is thereby a direct competitor to Catalyst.

**ANSWER:** Denied.

57. Upon information and belief, Mr. Smith and Mr. Bloomfield discussed Mr. Smith working in some capacity with Provisio, likely as an independent consultant.

**ANSWER:** Defendants admit that Tim and Mr. Bloomfield at times discussed the possibility of Tim providing independent consulting services. The remaining allegations are denied.

58. On or about December 8, 2024, Mr. Smith tendered his resignation. His last day at Catalyst was December 30, 2024.

**ANSWER:** Admitted.

59. Upon information and belief, by late January 2025, Mr. Smith was working with Provisio as an independent consultant.

**ANSWER:** Defendants admit that Tim began providing independent consulting services to Provisio in early 2025. The remaining allegations are denied.

60. Shortly after Mr. Smith tendered his resignation, on or about December 11, 2024, Arvin Talwar met with Nicole Smith at Arvin's office in Chicago.

**ANSWER:** Admitted.

61. Arvin asked Mrs. Smith whether, in light of her husband's resignation and apparent conflict with Catalyst, she could continue in her role and work for Catalyst's benefit.

**ANSWER:** Defendants admit that Arvin Talwar asked Nikki whether she could continue in her role. Defendants deny the remaining allegations of Paragraph 61, including the characterizations of an "apparent conflict" and of what working "for Catalyst's benefit" entailed.

62. Mrs. Smith answered affirmatively. She expressed her desire to remain an employee with Catalyst and made promises that she could keep her personal interests and work separate.

**ANSWER:** Defendants admit that Nikki answered affirmatively and expressed her desire to remain a Catalyst employee. The remaining allegations are denied.

63. Mrs. Smith further stated, unprompted, that Mr. Smith would not be doing work in the public sector.

**ANSWER:** Denied.

64. Catalyst reasonably relied on Mrs. Smith's representations and kept her in her position.

**ANSWER:** Denied.

15

65.     Upon information and belief, in or around January 2025, Mr. Smith started his own independent consulting firm and began actively communicating with Catalyst's employees, subcontractors, and customers.

**ANSWER:** Denied.

66.     Upon information and belief, each communication and its circumstances, as outlined below, indicate a violation of Mr. Smith's contractual obligation not to compete.

**ANSWER:** Paragraph 66 states a legal conclusion to which no response is required. To the extent a response is required, denied.

67.     On or about February 24, 2025, Mr. Smith reached out to Stephanie Perrin, Vice President of Delivery at Catalyst, and asked to set up a conversation with her.

**ANSWER:** Defendants admit that on or about February 24, 2025 Tim contacted Stephanie Perrin to arrange a conversation. The remaining allegations are denied.

68.     On or about March 4, 2025, Ms. Perrin and Mr. Smith had a remote meeting over Microsoft Teams. Id.

**ANSWER:** Admitted.

69.     At that meeting, Mr. Smith asked Ms. Perrin to forward him confidential Catalyst documents and asked for information about ongoing business matters. Ms. Perrin provided the requested documents.

**ANSWER:** Denied.

70.     On or about February 26, 2025, Mr. Smith contacted Catalyst's contacts on active projects with the Region of York, Ontario, Canada.

**ANSWER:** Defendants admit that on or about February 26, 2025 Tim communicated with individuals at the Region of York. The remaining allegations are denied.

16

71. Catalyst had ongoing work in constructing York's non-emergency services information system. The project was divided into two phases, the first of which Richard Leest directed. In early 2025, following a pause between project phases, Catalyst was informed that Phase Two would be starting but would be led by a different individual.

**ANSWER:** Defendants admit that Catalyst had ongoing work for the Region of York on a phased non-emergency services information system project. The remaining allegations are denied.

72. On or about February 26, 2025, Mr. Smith contacted both Mr. Leest and Phase Two's executive sponsor, Deanna Hotoyan. Upon information and belief, Mr. Smith informed both that he resigned from Catalyst and he was starting his own business.

**ANSWER:** Defendants admit that on or about February 26, 2025 Tim communicated with Mr. Leest and Ms. Hotoyan. The remaining allegations, including all allegations made on information and belief, are denied.

73. On February 26, 2025, Mr. Smith contacted Ben Perry, a technology-sector journalist based in Canada. Upon information and belief, Mr. Perry also advises Canadian municipalities and technology firms on beneficial connections and potential partnerships.

**ANSWER:** Defendants admit that on or about February 26, 2025 Tim contacted Ben Perry, a Canadian technology-sector journalist. The remaining allegations are denied.

74. Mr. Smith informed Mr. Perry about his resignation from Catalyst and requested a meeting. Upon information and belief, Mr. Smith and Mr. Perry met and discussed a request for proposals made by the government for Grinsby, Canada.

**ANSWER:** Defendants admit that Tim informed Mr. Perry of his resignation and requested a meeting. The remaining allegations are denied.

17

75. Upon information and belief, Mr. Smith knew or reasonably would have known that Catalyst was also considering responding to Grinsby's request for proposals.

**ANSWER:** Denied.

76. On or about March 4, 2025, Mr. Smith contacted Varun Nithianadam, a subcontractor for Catalyst that worked almost exclusively for Catalyst. Mr. Smith asked that Nithianadam's employees "keep [the communication] confidential from Catalyst."

**ANSWER:** Defendants admit that on or about March 4, 2025 Tim contacted Varun Nithianadam, a Catalyst subcontractor. The remaining allegations are denied.

77. On or about March 5, 2025, Mr. Smith communicated with Anesh Mistry, CEO of MuniPass, a Toronto-based competitor of Catalyst's. Mr. Smith informed Mr. Mistry that Mr. Smith was starting his own company and they should "keep in touch."

**ANSWER:** Defendants admit that on or about March 5, 2025 Tim communicated with Anesh Mistry of MuniPass and informed him that Tim had left Catalyst. The remaining allegations are denied.

78. On or about March 11, 2025, Mr. Smith communicated with the CEO of Spectrum 1. Spectrum 1 is a subcontractor for Catalyst, with Catalyst providing approximately 80% of Spectrum 1's work. Due to this close working relationship, Spectrum 1 has had significant access to Catalysts' internal, confidential information.

**ANSWER:** Defendants admit that on or about March 11, 2025 Tim communicated with the CEO of Spectrum 1, a Catalyst subcontractor. The remaining allegations are denied.

79. Mr. Smith asked that Spectrum 1's CEO to "keep [the communication] confidential from Catalyst."

18

**ANSWER:** Defendants admit that Tim asked that the communication be kept confidential from Catalyst. Answering further, Tim likewise instructed Catalyst personnel not to share confidential Catalyst information with him. The remaining allegations are denied.

80.     Upon information and belief, based on Mr. Smith's communication, Spectrum 1 has taken on work with Provisio.

**ANSWER:** Defendants admit that Spectrum 1 subsequently performed work for Provisio. Defendants deny that any such work resulted from Tim's communication and deny the remaining allegations.

81.     In or around early March 2025, Mr. Smith contacted Stephanie Popper of Slalom, a Canadian competitor to Catalyst, to discuss a "Toronto strategy." Slalom provides similar technology services as Catalyst but was not known for working in the public sector, unlike Catalyst. Upon information and belief, Catalyst and Slalom were part of the same 5-vendor pool bidding on work from the City of Toronto.

**ANSWER:** Defendants admit that in or around early March 2025 Tim communicated with Stephanie Popper of Slalom regarding Toronto. The remaining allegations are denied.

82.     In or around late March 2025, the City of Toronto solicited bids from its vendor pool. Catalyst responded, but Slalom did not.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 82, which has the effect of a denial, and on that basis the allegations are denied.

83.     Subsequently, Toronto cancelled the Request for Proposals and bids for the project; but, in or around September 2025, the city reopened the project for bids.

19

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 83, which has the effect of a denial, and on that basis the allegations are denied.

84.     Slalom then submitted a bid to Toronto for the project.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 84, which has the effect of a denial, and on that basis the allegations are denied.

85.     Upon information and belief, Mr. Smith's communications with Slalom contributed to its decision to submit a bid for the City of Toronto's project and to directly compete with Catalyst for the work.

**ANSWER:** Denied.

86.     In or around summer 2024, the City of Chicago, Illinois, sought to update its non-emergency service information systems, which Catalyst had originally created. The City of Chicago requested proposals.

**ANSWER:** Defendants admit that in or around summer 2024 the City of Chicago solicited proposals concerning its non-emergency service information systems and that Catalyst had originally built the CHI311 system. The remaining allegations are denied.

87.     Catalyst and Clarity Partners, a competitor, submitted bids.

**ANSWER:** Admitted on information and belief.

88.     Upon information and belief, although Clarity Partners provides similar services to Catalyst, it does so using different technology platforms and is not known for working on municipality information systems, built on the Salesforce platform.

20

**ANSWER:** Defendants admit, on information and belief, that Clarity Partners provides similar services using different technology platforms. Defendants lack knowledge or information sufficient to form a belief as to Clarity Partners' reputation, and the remaining allegations are denied.

89.    In or around April 2025, Mr. Smith arranged and held a meeting with Clarity Partners, a Catalyst competitor.

**ANSWER:** Defendants admit that in or around April 2025 Tim attended a lunch meeting with Clarity Partners personnel. The remaining allegations are denied.

90.    In or around September 2024, the City of Chicago requested that Catalyst provide various contract documents. The requested documents are typically requested only when a vendor is in the final stages of being selected for a project.

**ANSWER:** Defendants admit, on information and belief, that in or around September 2024 the City of Chicago requested contract documents from Catalyst. The remaining allegations are denied.

91.    Following a period of silence, however, Catalyst then received a letter from the City of Chicago in July 2025 indicating it was formally declining Catalyst's proposal for the project. Catalyst later learned that Clarity Partners was selected for the project.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 91, which has the effect of a denial, and on that basis the allegations are denied.

92.    Upon information and belief, Mr. Smith's knowledge of Catalyst's operations and communication with Clarity Partners informed Clarity Partners' bid against Catalyst for the City of Chicago's project.

**ANSWER:** Denied.

93.     Upon information and belief, in or around April 2025, Mr. Smith contacted Quant 16 and entered into an agreement with them to provide business growth strategies as an independent consultant.

**ANSWER:** Defendants admit that in or around April 2025 Tim, through Smith Technology Lab, LLC, entered into an agreement with Quant 16 to provide business-growth consulting services. The remaining allegations are denied.

94.     Quant 16 is a competitor to Catalyst, but, on occasion, would also work with Catalyst as a subcontractor when advantageous for the companies to join forces.

**ANSWER:** Defendants admit that Quant 16 at times competed with Catalyst and at times worked with Catalyst as a subcontractor. The remaining allegations are denied.

95.     In or around June and July 2025, Catalyst was negotiating a Teaming Agreement with Quant 16 for the two companies to submit as part of a joint bid for a project with the City of Chicago's Police Department/Office of Emergency Management and Communications ("PD/OEMC"). During the negotiation of this Teaming Agreement, Catalyst discussed win strategies with the Quant 16 representative.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 95, which has the effect of a denial, and on that basis the allegations are denied.

96.     In the eleventh hour of negotiations, Quant 16 abruptly informed Catalyst that it would no longer be part of the agreement or Catalyst's bid for the PD/OEMC project.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 96, which has the effect of a denial, and on that basis the allegations are denied.

97. In or around July 2025, Mr. Smith was actively working as an independent consultant for both Provisio and Quant 16.

**ANSWER:** Admitted.

98. Upon information and belief, Quant 16 then began working with Provisio, who the Smiths were working with.

**ANSWER:** Defendants admit that Quant 16 worked with Provisio. The remaining allegations are denied.

99. Upon information and belief, Quant 16 and Provisio entered into a contractor/subcontractor relationship and submitted a competing bid for the City of Chicago's PD/OEMC project.

**ANSWER:** Defendants admit, on information and belief, that Quant 16 and Provisio pursued the referenced City of Chicago project. Answering further, both Tim and Nikki recused themselves in writing from that pursuit (PROCAT000126; PROCAT000142). The remaining allegations are denied.

100. Upon information and belief, Mr. Smith's communications with Quant 16 directly informed its decision to stop working with Catalyst, start working with Provisio, and participate in a competing bid for the City of Chicago's work. Mr. Smith Communicates with Catalyst's Competitor, Cloud SynApps, to Facilitate a Competing Bid

**ANSWER:** Denied.

101.    In or around July 2025, Mr. Smith communicated with numerous individuals, including Dishad Albert, from Cloud SynApps.

ANSWER:    Defendants admit that in or around July 2025 Tim communicated with individuals at Cloud SynApps, including Dishad Albert. The remaining allegations are denied.

102.    Upon information and belief, Cloud SynApps performed similar work to Catalyst but on a smaller scale, such that it did not normally compete with Catalyst for large municipality work.

ANSWER:    Defendants admit that Cloud SynApps performs work similar to Catalyst's on a smaller scale. The remaining allegations are denied.

103.    Upon information and belief, following Mr. Smith's communication with Albert, Albert requested Mr. Smith's assistance in preparing materials for a bid to present to the government for Minneapolis, Minnesota. Upon information and belief, Mr. Smith provided such assistance under the guise of his independent consulting company.

ANSWER:  Denied.

104.    Catalyst was also actively pursuing Minneapolis's project.

ANSWER:    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 104, which has the effect of a denial, and on that basis the allegations are denied.

105.    Upon information and belief, Mr. Smith's assistance facilitated Cloud SynApps's ability to compete with Catalyst for the Minneapolis project.

ANSWER:  Denied.

106.    Upon information and belief, both Catalyst and Cloud SynApps were shortlisted for the project, and Catalyst ultimately being awarded the project.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 106, except Defendants admit, on information and belief, that Catalyst was awarded the Minneapolis project. The remaining allegations are denied.

107. On July 15, 2025, Mr. Smith contacted Matthew Kueker of Kenway Consulting.

**ANSWER:** Admitted.

108. Upon information and belief, although Kenway Consulting provides similar technology services as Catalyst, its clientele typically is from the healthcare industry and private sector.

**ANSWER:** Defendants admit that Kenway Consulting provides similar technology services with a clientele that has typically included healthcare. The remaining allegations are denied.

109. Upon information and belief, Mr. Smith and Mr. Kueker discussed Mr. Smith's employment and Mr. Kueker's desire for Mr. Smith to join Kenway and lead a public sector practice group, in direct competition with Catalyst.

**ANSWER:** Defendants admit that Tim and Mr. Kueker discussed potential collaboration and Kenway's interest in Tim. The remaining allegations are denied.

110. Upon information and belief, the above provide merely a few examples of Mr. Smith's willful disregard for his obligations under the Agreement. Such examples demonstrate a clear pattern of communication with prohibited individuals, are indicative of the divulgence of company confidential information, and support the existence of further, yet-to-be-identified violations of the Agreement.

**ANSWER:** Denied.

111. On or about March 20, 2025, Eric Talwar had a regularly scheduled meeting over Microsoft Teams with Mrs. Smith.

25

**ANSWER:** Admitted.

112.    During the meeting, Mrs. Smith voluntarily shared her computer screen with Eric.

**ANSWER:** Admitted.

113.    Eric saw on Mrs. Smith's screen texts between Mr. and Mrs. Smith that discussed her "pull[ing]" job applications for positions at Catalyst for Mr. Smith to send to Provisio.

**ANSWER:** Defendants admit that text messages between Tim and Nikki were visible on the shared screen. The texts speak for themselves; Defendants deny any characterization inconsistent with them and deny the remaining allegations.

114.    Eric took a screenshot of these texts. See Exhibit C ("Ex. C").

**ANSWER:** Defendants admit that Eric Talwar photographed or captured an image of the screen, which Catalyst attached to the Amended Complaint as Exhibit C. Defendants deny the remaining allegations.

115.    The texts stated as follows: Mrs. Smith to Mr. Smith: As I'm going through resumes for the dip shit squad do you want me to pull any for [P]rovisio? Of the good ones[.] Mr. Smith: Yeah I would. . . Make life easier in a few weeks or month[s.] Mrs. Smith: I'm looking at Sr SA/team lead, SA, PM, BA, jr BA. Mr. Smith: Those are all the roles we'll need[.] Id.

**ANSWER:** Defendants admit that the quoted text messages were exchanged between Nikki and Tim. The messages speak for themselves; Defendants deny any characterization inconsistent with them.

116.    Such applications are of particular value within Catalyst's industry, as the industry requires highly skilled employees, particularly for senior positions, of which there is a short supply.

**ANSWER:** Denied.

26

117. Mrs. Smith's employment was terminated the same day.

**ANSWER:** Admitted.

118. Before her termination, Mrs. Smith had extensive access to client and applicant information.

**ANSWER:** Defendants admit that Nikki had access to applicant and client information as necessary to her role. Defendants deny that her access was "extensive" and deny the remaining allegations.

119. Upon information and belief, Mr. and Mrs. Smith gathered and disclosed to Provisio data from Catalyst regarding job applicants both during and after their terms of employment.

**ANSWER:** Denied.

120. Upon information and belief, Mr. and Mrs. Smith gathered and disclosed to Provisio data from Catalyst regarding clients and internal processes and procedures, both during and after their terms of employment.

**ANSWER:** Denied.

121. Further, upon information and belief, Mrs. Smith's interest in her husband's relationship with Provisio caused her to ignore her job responsibilities, including but not limited to failing to follow-up with a candidate Catalyst wanted to hire.

**ANSWER:** Denied.

122. Upon information and belief, on her termination, Mrs. Smith went to work for her husband's "independent" consulting firm and with Provisio.

**ANSWER:** Denied.

123. Plaintiff re-alleges and incorporates by reference the allegations in paragraphs 1 through 122 as if fully set forth herein.

**ANSWER:** Defendants incorporate their responses to Paragraphs 1 through 122 as if fully set forth herein.

124. Mr. Smith, as an officer and employee of Catalyst, owed a duty of loyalty to Catalyst.

**ANSWER:** The Court dismissed Count I as against Tim (Dkt. 17), and Catalyst re-pled it solely to preserve the issue (Dkt. 40 at 16 n.1); the Court's July 2, 2026 Order confirmed the claim "remains dismissed" (Dkt. 69 at 11 n.6). No response is required. To the extent a response is required, Paragraph 124 states a legal conclusion and is denied.

125. Mrs. Smith, as an employee of Catalyst, owed a duty of loyalty to Catalyst.

**ANSWER:** Paragraph 125 states a legal conclusion to which no response is required. To the extent a response is required, denied.

126. Defendants breached this duty by working on Mr. Smith's new business on Catalyst's time and ignoring their Catalyst duties in favor of pursuing new business opportunities and establishing new business with Provisio, at least from July 2024 through the end of their employment. Plaintiff acknowledges this Court's dismissal of this Count against Timothy Smith (ECF 17) and merely keeps it included to preserve the issue.

**ANSWER:** Denied.

127. Defendants breached this duty by providing Catalyst's information to a competing business, including client and applicant information and other confidential information regarding business processes.

**ANSWER:** Denied.

128. Catalyst was damaged by the Defendants' breach of fiduciary duty, including but not limited to: a. paying Defendants while at the same time Defendants were working on plans to be competitors, b. the loss of clients, c. the loss of applicants and damages necessitated by restarting

28

its hiring processes, d. the loss of its proprietary and confidential information, and e. the resulting loss in market share and competitiveness.

**ANSWER:** Denied, including each of subparagraphs (a) through (e).

129. The Smiths' actions were intentional as well as willful and wanton.

**ANSWER:** Denied.

130. Plaintiff re-alleges and incorporates by reference the allegations in paragraphs 1 through 129 as if fully set forth herein.

**ANSWER:** Defendants incorporate their responses to Paragraphs 1 through 129 as if fully set forth herein.

131. Mrs. Smith, as an employee of Catalyst, had a fiduciary duty of loyalty to Catalyst.

**ANSWER:** Paragraph 131 states a legal conclusion to which no response is required. To the extent a response is required, denied.

132. Mr. Smith was aware that Mrs. Smith was an employee of Catalyst and had a fiduciary duty to Catalyst.

**ANSWER:** Defendants admit that Tim knew Nikki was a Catalyst employee. The remaining allegations state legal conclusions and are denied.

133. Mrs. Smith breached this duty by providing her husband with Catalyst's confidential information which he was using to aid a competitor and create a new business, while ignoring her Catalyst duties in favor of establishing business relationships with Provisio and other entities.

**ANSWER:** Denied.

134. Mrs. Smith breached this duty by taking Catalyst's information and providing it to Mr. Smith, knowing he would provide it to competing entities.

**ANSWER:** Denied.

135. Mr. Smith aided and abetted Mrs. Smith's breach of her fiduciary duty by knowingly receiving Catalyst's confidential business information from Mrs. Smith, transferring that information to competitors, including Provisio, and actively encouraging her to do so.

**ANSWER:** Denied.

136. Catalyst was damaged by the Defendants' breach of fiduciary duty, including but not limited to: a. paying Defendants while at the same time Defendants were working on plans to be competitors, b. the loss of clients, c. the loss of applicants and damages necessitated by restarting its hiring processes, d. the loss of its proprietary information, and e. the resulting loss in market share and competitiveness.

**ANSWER:** Denied, including each of subparagraphs (a) through (e).

137. Mr. Smith's actions were intentional as well as willful and wanton.

**ANSWER:** Denied.

138. Plaintiff re-alleges and incorporates by reference the allegations in paragraphs 1 through 137 as if fully set forth herein.

**ANSWER:** Defendants incorporate their responses to Paragraphs 1 through 137 as if fully set forth herein.

139. In a meeting with Arvin Talwar occurring on December 11, 2024, after Mr. Smith's resignation, Arvin asked Mrs. Smith directly whether she could continue in her role based on the conflict and issues between Catalyst and her husband.

**ANSWER:** Defendants admit that Arvin Talwar met with Nikki on or about December 11, 2024, after Tim's resignation, and asked whether she could continue in her role. The remaining allegations are denied.

30

140. Mrs. Smith stated that she could. She expressed that she wished to remain a Catalyst employee, assured Arvin that she could continue to work for the benefit of Catalyst, and added that Mr. Smith would not be working in the public sector.

**ANSWER:** Defendants admit that Nikki stated she could continue in her role and expressed her wish to remain a Catalyst employee. The remaining allegations are denied.

141. The statements in paragraphs 62 through 63 ("the Representations") were false.

**ANSWER:** Denied.

142. Mrs. Smith knew the Representations were false when she made them.

**ANSWER:** Denied.

143. Mrs. Smith wanted to stay with Catalyst to be a source for Mr. Smith, using Catalyst's resources to obtain information to benefit Mr. Smith and his developing business relationships with Catalyst's competitors.

**ANSWER:** Denied.

144. Mrs. Smith knew that Mr. Smith had already or would soon be divulging Catalyst's confidential and proprietary information to competitors.

**ANSWER:** Denied.

145. Mrs. Smith made the Representations to Arvin with the intent to induce him to continue her employment and thus allow her to assist Mr. Smith in transferring Catalyst's confidential, proprietary information and trade secrets to its competitors, including Provisio.

**ANSWER:** Denied.

146. Catalyst reasonably relied on the Representations, allowing Mrs. Smith to keep her job.

**ANSWER:** Denied.

31

147. The Representations were part of a scheme to defraud Catalyst, concocted by Mrs. Smith and her husband, whereby they would convince Catalyst to keep Mrs. Smith on staff, and she would be the conduit for the theft of Catalyst's information.

**ANSWER:** Denied.

148. Catalyst was damaged by Mrs. Smith's fraud, including but not limited to: a. paying Mrs. Smith after the Representations were made when she was acting in a hostile manner to Catalyst and stealing its information for her husband's benefit, b. the loss of applicants and damages necessitated by restarting hiring processes, c. the loss of its proprietary information, and, d. the resulting loss in market share and competitiveness.

**ANSWER:** Denied, including each of subparagraphs (a) through (d).

149. Mrs. Smith's actions were intentional as well as willful and wanton.

**ANSWER:** Denied.

150. Plaintiff re-alleges and incorporates by reference the allegations in paragraphs 1 through 149 as if fully set forth herein.

**ANSWER:** Defendants incorporate their responses to Paragraphs 1 through 149 as if fully set forth herein.

151. Timothy Smith and Catalyst entered into the valid Agreement governing Smith's employment. Ex. A.

**ANSWER:** Defendants admit that Tim and Catalyst executed the Agreement attached as Exhibit A. The remaining allegations state legal conclusions and are denied.

152. Paragraph 4 of the Agreement prohibits Mr. Smith from soliciting the trade or patronage of Catalyst's customers, subcontractors, or employees. (Ex. A at § 4).

**ANSWER:** The Agreement (Dkt. 40-1) is a written document that speaks for itself. Defendants admit that Paragraph 152 purports to quote from or characterize that document, deny any quotation or characterization inconsistent with the document's terms, and deny the remaining allegations of Paragraph 152.

153. On or about February 24, 2025, Timothy Smith solicited Ms. Perrin, a Catalyst employee, to provide company confidential information.

**ANSWER:** Denied.

154. On or about March 20, 2025, Timothy Smith solicited his wife, Nicole Smith, then a Catalyst employee, to provide confidential job applicant information.

**ANSWER:** Denied.

155. Timothy Smith, while at Catalyst, worked with two significant subcontractors of Catalyst, Varun Nithianadam and Spectrum 1, both of whom substantially contributed to Catalyst's work.

**ANSWER:** Defendants admit that, while at Catalyst, Tim worked with Catalyst subcontractors including Varun Nithianadam and Spectrum 1. The remaining allegations are denied.

156. Timothy Smith solicited both of these subcontractors following his departure and at least Spectrum 1 was brought on to perform work at Provisio.

**ANSWER:** Defendants admit that Spectrum 1 subsequently performed work for Provisio. Defendants deny that Tim solicited either subcontractor and deny the remaining allegations.

157. Upon information and belief, Timothy Smith has solicited other of Catalyst's subcontractors, customers, and employees.

**ANSWER:** Denied.

158. These solicitations constitute breaches of Paragraph 4 of the Agreement.

**ANSWER:** Paragraph 158 states a legal conclusion to which no response is required. To the extent a response is required, denied.

159. Paragraph 5 provides that former employees will not "enter into any business or employment with past or current customers of Employer or any potential customers with whom the Employee has come into contact." (Ex. A at § 5).

**ANSWER:** The Agreement speaks for itself. Defendants state that the Court's July 2, 2026 Order held that no ripe claim is stated under Paragraphs 5 and 6 of the Agreement and struck Paragraph 168 (Dkt. 69 at 6–7). No response is required to allegations offered solely in support of an unripe claim. To the extent a response is required, Defendants deny any characterization inconsistent with the Agreement's terms and deny the remaining allegations.

160. Paragraph 6 provides, in pertinent part, that former employees will not "directly or indirectly, accept employment with any Employer client." (Ex. A at § 6).

**ANSWER:** The Agreement speaks for itself. Defendants state that the Court's July 2, 2026 Order held that no ripe claim is stated under Paragraphs 5 and 6 of the Agreement and struck Paragraph 168 (Dkt. 69 at 6–7). No response is required to allegations offered solely in support of an unripe claim. To the extent a response is required, Defendants deny any characterization inconsistent with the Agreement's terms and deny the remaining allegations.

161. Timothy Smith is working with Catalyst's competitor, Provisio.

**ANSWER:** Defendants admit that Tim provides independent consulting services to Provisio. Defendants deny that Provisio is properly characterized as Catalyst's competitor and deny the remaining allegations.

34

162. In or around June and July 2025, Catalyst was negotiating with Quant 16, a competitor whom Catalyst sometimes subcontracted with, to submit a bid to work for the City of Chicago, a long-standing Catalyst client, on a system for its PD/OEMC.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 162, which has the effect of a denial, and on that basis the allegations are denied.

163. In or around July 2025, Smith communicated with Quant 16, whom he met through his work at Catalyst.

**ANSWER:** Defendants admit that in or around July 2025 Tim communicated with Quant 16. The remaining allegations are denied.

164. Quant 16 abruptly ended its relationship with Catalyst.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 164, which has the effect of a denial, and on that basis the allegations are denied.

165. Quant 16 began working with Provisio, who then submitted a bid for the PD/OEMC project.

**ANSWER:** Defendants admit that Quant 16 worked with Provisio. Defendants deny the remaining allegations, including any suggestion that Tim caused that relationship.

166. Timothy Smith not only solicited a Catalyst subcontractor but actively worked with both Provisio and Quant 16 to submit a bid in competition to Catalyst's proposal for the PD/OEMC project.

**ANSWER:** Denied.

167.    Timothy Smith's actions in regard to this project constitute a breach of Paragraph 4 of the Agreement.

**ANSWER:** Denied.

168.    Additionally, should the contract be awarded to Quant 16 and Provisio, Mr. Smith's work with both will be a violation of Paragraphs 5 and 6 of the Agreement.

**ANSWER:** Paragraph 168 was stricken by the Court's July 2, 2026 Opinion and Order (Dkt. 69 at 6–7). No response is required.

169.    Upon information and belief, Mr. Smith has communicated with a host of Catalyst's employees, competitors, customers, and subcontractors, including but not limited to those outlined above in paragraphs 67 to 109, in an effort to sell his insider knowledge of Catalyst to them as a competitive advantage and undermine Catalyst's business endeavors.

**ANSWER:** Denied.

170.    Paragraph 3 of the Agreement provides that an employee will not, for twelve months following the termination of employee, divulge any confidential information "relating to or concerning any phase of Employer's or his/her customer's business or operations." (Ex. A at § 3).

**ANSWER:** The Agreement (Dkt. 40-1) is a written document that speaks for itself. Defendants admit that Paragraph 170 purports to quote from or characterize that document, deny any quotation or characterization inconsistent with the document's terms, and deny the remaining allegations of Paragraph 170.

171.    Mr. Smith has taken to Catalyst's competitors, including but not limited to Provisio and those outlined above in paragraphs 67 to 109, and is using the confidential information he learned through his many years at Catalyst for the benefit of those entities.

**ANSWER:** Denied.

172. Upon information and belief, Mr. Smith has used information about Catalyst's subcontractors, partners, employees, and municipalities to whom Catalyst has submitted bids, all learned while employed at Catalyst, to allow Catalyst's competitors to replicate its business model, disclosing and using such information, in violation of Paragraph 3 of the Agreement.

**ANSWER:** Denied.

173. Catalyst was and continues to be damaged by the breaches detailed in this Count through the loss of its subcontracting partner, Quant 16, the use of its subcontracting partner for a competitor, and, if the PD/OEMC project is not awarded to it, through the loss of revenue.

**ANSWER:** Denied.

174. Catalyst was and continues to be damaged by the breaches detailed in this Count through, among other things: a. the loss of confidentiality over its proprietary information, b. the loss of its competitive business advantage, and c. damage to client relationships.

**ANSWER:** Denied, including each of its subparagraphs.

175. As Mr. Smith has been disregarding his obligations under the Agreement, the Agreement's term should be extended for an additional twelve months.

**ANSWER:** Denied.

176. Plaintiff re-alleges and incorporates by reference the allegations in paragraphs 1 through 175 as if fully set forth herein.

**ANSWER:** Count V was dismissed by the Court's July 2, 2026 Opinion and Order (Dkt. 69). No response is required. To the extent a response is required, denied.

177. Through her work on talent acquisition for Catalyst, Mrs. Smith was intimately familiar with the conditions, restrictions, and prohibitions contained in the Handbook.

37

**ANSWER:** Count V was dismissed by the Court's July 2, 2026 Opinion and Order (Dkt. 69). No response is required. To the extent a response is required, denied.

178. Mrs. Smith verbally agreed to comply with the Handbook's requirements.

**ANSWER:** Count V was dismissed by the Court's July 2, 2026 Opinion and Order (Dkt. 69). No response is required. To the extent a response is required, denied.

179. The agreement to comply with the Handbook is a valid contract.

**ANSWER:** Count V was dismissed by the Court's July 2, 2026 Opinion and Order (Dkt. 69). No response is required. To the extent a response is required, denied.

180. Catalyst complied with all conditions precedent to recover.

**ANSWER:** Count V was dismissed by the Court's July 2, 2026 Opinion and Order (Dkt. 69). No response is required. To the extent a response is required, denied.

181. Despite this familiarity with the Handbook, Mrs. Smith gathered company confidential applicant information from Catalyst for the benefit of her husband's business enterprise. This is no way benefited Catalyst and was in direct competition with its interest.

**ANSWER:** Count V was dismissed by the Court's July 2, 2026 Opinion and Order (Dkt. 69). No response is required. To the extent a response is required, denied.

182. Mrs. Smith provided that company confidential applicant information to her husband after he was no longer a Catalyst employee to benefit her husband's business enterprises.

**ANSWER:** Count V was dismissed by the Court's July 2, 2026 Opinion and Order (Dkt. 69). No response is required. To the extent a response is required, denied.

183. Each of these actions was in direct violation to the Handbook's terms, conditions, restrictions, and prohibitions.

**ANSWER:** Count V was dismissed by the Court's July 2, 2026 Opinion and Order (Dkt. 69). No response is required. To the extent a response is required, denied.

184. Mrs. Smith violated the Handbook's Moonlighting restrictions. (See Ex. B at 22). Not only did Mrs. Smith's gathering of resumes violate this provision, but her interest in her and Mr. Smith's future with Provisio caused her to ignore her responsibilities, including failing to maintain contact with job candidates Catalyst desired to hire.

**ANSWER:** Count V was dismissed by the Court's July 2, 2026 Opinion and Order (Dkt. 69). No response is required. To the extent a response is required, denied.

185. Mrs. Smith also violated the Handbook's obligations concerning confidential information which prohibited divulging and discussing with third parties "any other trade secrets or confidential and proprietary information you acquired, learned or developed by any means whatsoever during your employment by Catalyst, relating to or concerning any phase of Catalyst's or its customer's business or operations." (Ex. B at 25).

**ANSWER:** Count V was dismissed by the Court's July 2, 2026 Opinion and Order (Dkt. 69). No response is required. To the extent a response is required, denied.

186. Mrs. Smith used information about Catalyst's subcontractors, partners, employees, and municipalities to whom Catalyst has submitted bids, all learned during the course of her employment at Catalyst, to allow Mr. Smith to provide Catalyst's competitors information to replicate Catalyst's successful business model, disclosing and using such information while at Provisio, in violation of the Handbook.

**ANSWER:** Count V was dismissed by the Court's July 2, 2026 Opinion and Order (Dkt. 69). No response is required. To the extent a response is required, denied.

39

187.     Plaintiff was damaged through the breaches of the Handbook detailed in this Count through, but not limited to, the loss of honest services from Mrs. Smith during her employment, the loss of company confidential and propriety information, the provision its business model, tactics, and information to a direct competitor, and the loss of its prospective employees.

**ANSWER:** Count V was dismissed by the Court's July 2, 2026 Opinion and Order (Dkt. 69). No response is required. To the extent a response is required, denied.

Defendants deny that Plaintiff is entitled to any of the relief requested in the unnumbered WHEREFORE paragraphs following each Count or elsewhere in the Amended Complaint, and deny all allegations not expressly admitted above.

## AFFIRMATIVE DEFENSES

Without assuming any burden of proof they would not otherwise bear, Defendants assert the following defenses.

### FIRST AFFIRMATIVE DEFENSE — Failure to State a Claim

The Amended Complaint fails to state a claim upon which relief can be granted, including for the reasons stated in the Court's September 25, 2025 and July 2, 2026 Orders (Dkt. 17; Dkt. 69) as to the dismissed and narrowed claims.

### SECOND AFFIRMATIVE DEFENSE — ITSA Preemption

Counts I and II are preempted by the Illinois Trade Secrets Act, 765 ILCS 1065/8 to the extent they are premised on the alleged misappropriation, transfer, or use of confidential or proprietary information rather than on conduct independent of such information.

### THIRD AFFIRMATIVE DEFENSE — No Protectable Interest / Overbreadth As Applied

Count IV is limited to Paragraphs 3 and 4 of the Agreement: the Court's July 2, 2026 Order struck Paragraph 168 of the Amended Complaint and held that no ripe claim is stated

under the Agreement's non-compete Paragraphs 5 and 6, whose enforceability the Court declined to reach (Dkt. 69 at 6–7); the twelve-month restrictive periods have in any event expired by their own terms. Count IV further fails to the extent it would apply Paragraph 3 of the Agreement to information that is public, generally known, or not confidential. Catalyst's public-sector procurement work is conducted through public bidding: client identities, solicitations, bids, and awards are public records. The principal "data" Catalyst has pointed to is a publicly available cooperative-purchasing solicitation, Sourcewell RFP #060624. Enforcement of a confidentiality covenant against public information exceeds any legitimate protectable interest.

## FOURTH AFFIRMATIVE DEFENSE — Waiver, Estoppel, and Consent

Catalyst's claims are barred in whole or in part by waiver, estoppel, and consent. After Tim's resignation, Catalyst treated him as a trusted collaborator: it accepted his written transition inventory and circulated it internally; it kept him on Catalyst's website and proposed re-titling him "Advisor"; it prepared an all-staff announcement praising his "20 years of remarkable service"; it conducted a cooperative wind-down of his benefits and property; and in February 2025 its CEO solicited Tim's continued assistance with Catalyst's Region of Halton litigation, offering that "we can agree on some consideration"

## FIFTH AFFIRMATIVE DEFENSE — Failure to Mitigate

Catalyst failed to mitigate its alleged damages, including by failing to seek a debriefing, evaluation records, or protest remedies for the competitive procurements it claims to have lost, and by failing to take reasonable steps to retain the business relationships it claims were harmed.

## SIXTH AFFIRMATIVE DEFENSE — Independent and Intervening Causes

Catalyst's alleged damages were caused by factors independent of any conduct of Defendants, including: (a) Catalyst's abandoned sale processes and resulting management

41

decisions (Dkt. 40 ¶¶ 44–46); (b) client dissatisfaction with Catalyst's own delivery documented before and independent of the conduct alleged, including on the City of Chicago Department of Law engagement; and (c) ordinary competitive dynamics in public procurement, including the City of Chicago CHI311 task order, for which Catalyst's proposal was submitted on June 25, 2024 — while Tim was Catalyst's COO— and the CPD/OEMC task order, whose qualified-vendor distribution included Catalyst and Clarity Partners but not Provisio or Quant 16.

### SEVENTH AFFIRMATIVE DEFENSE — Setoff and Recoupment

Any recovery by Catalyst must be set off and reduced by the amounts Catalyst owes Tim as alleged in the Counterclaim, including unpaid earned commissions.

### EIGHTH AFFIRMATIVE DEFENSE — Double Recovery

Catalyst's damages claims are barred to the extent they seek amounts Catalyst is pursuing in other proceedings, including amounts that are the subject of Catalyst's separate litigation against the Region of Halton, Ontario.

### NINTH AFFIRMATIVE DEFENSE — Consent and Provenance of the Perrin Materials

Count IV fails to the extent premised on materials provided by Stephanie Perrin, because the documents she provided were her own templates created before her Catalyst employment — as she reported to Catalyst's leadership in writing on March 20, 2025: she "didn't share the Catalyst documents" and instead sent "a simple process guideline I created at a previous company about 5 years ago," describing the exchange as "uneventful" .

### TENTH AFFIRMATIVE DEFENSE — Payment

To the extent Catalyst seeks to recover compensation paid to Defendants, those payments were made for services actually rendered in the ordinary course, as reflected in Catalyst's own payroll records .

### ELEVENTH AFFIRMATIVE DEFENSE — Punitive Damages

Catalyst's claims for punitive damages are barred or limited because Defendants did not act willfully, wantonly, or with malice, and because an award of punitive damages on this record would violate due process.

### TWELFTH AFFIRMATIVE DEFENSE — Prior Material Breach

Catalyst's contract-based claims are barred, in whole or in part, because Catalyst committed the first material breach. No later than Tim's December 30, 2024 separation, Catalyst had already materially breached the parties' employment agreement—by withholding Tim's earned third- and fourth-quarter 2024 commissions. The post-employment solicitation and competition on which Catalyst's contract claims rest are alleged to have occurred afterward, in 2025 (Dkt. 40 ¶¶ 65–110). Under the first-to-breach rule, the party that commits the first material breach cannot enforce the agreement—including its restrictive covenants—against the other party, whose further performance is excused.

43

**DEFENDANT TIMOTHY SMITH'S COUNTERCLAIM AGAINST CATALYST CONSULTING GROUP, INC., ARVIN K. TALWAR, AND CINDY TALWAR**

Defendant/Counter-Plaintiff Timothy Smith ("Tim"), for his Counterclaim against Plaintiff/Counter-Defendant Catalyst Consulting Group, Inc. ("Catalyst") and, pursuant to Federal Rules of Civil Procedure 13(h), 19, and 20, additional Counter-Defendants Arvin K. Talwar and Cindy Talwar (the "Individual Counter-Defendants"), states as follows:

**PARTIES, JURISDICTION, AND VENUE**

1. Tim is a citizen of Indiana. Catalyst is an Illinois corporation with its principal place of business in Chicago, Illinois.

2. Counter-Defendant Arvin K. Talwar is Catalyst's Chief Executive Officer and Managing Principal and, on information and belief, a citizen of Illinois. At all relevant times, Arvin Talwar held and exercised final decision-making authority over Tim's compensation: Catalyst's own compensation term sheet provides that "[a]ll items are subject to change at the sole discretion of Arvin K. Talwar, CEO" (Catalyst0000061 ¶ 8), and the Amended Complaint admits that it was Arvin Talwar who "determined that Mr. Smith would not be receiving" his quarterly commissions for the final two fiscal quarters of 2024 (Dkt. 40 ¶ 53).

3. Counter-Defendant Cindy Talwar is Catalyst's Office Manager and, on information and belief, a citizen of Illinois. At all relevant times, Cindy Talwar administered and effectuated Catalyst's payroll and final-compensation process. She controlled and carried out the disbursement of his final payments.

4. Each Individual Counter-Defendant is an officer of Catalyst or an agent of Catalyst who knowingly permitted Catalyst to violate the Illinois Wage Payment and Collection Act with respect to Tim's final compensation, within the meaning of 820 ILCS 115/13.

44

5.     This Court has jurisdiction over this Counterclaim under 28 U.S.C. § 1367 because it is so related to the claims in the Amended Complaint—which put Tim's compensation, performance, and separation directly at issue—that it forms part of the same case or controversy, and independently under 28 U.S.C. § 1332 as to Catalyst.

6.     Venue is proper in this District under 28 U.S.C. § 1391(b).

## FACTUAL ALLEGATIONS

7.     Tim was employed by Catalyst from 2005 until December 30, 2024, ultimately serving as Managing Principal and Chief Operating Officer. (Dkt. 40 ¶¶ 20–21, 58.)

8.     Under Tim's compensation package, memorialized in a January 29, 2019 term sheet prepared by Catalyst—which Catalyst's office manager confirmed Tim "signed ... for the term sheet calculations in 2019"—Tim's compensation included, in addition to base salary, a quarterly commission "calculated as 12.5% of quarterly net income," payable "on the month subsequent to the end of each quarter," subject to a "sure up" reconciliation performed by Catalyst's outside accountants three to six months after payment. The commission was tied to a single objective measure—Catalyst's quarterly net income—and required no evaluation of Tim's performance.

9.     Catalyst paid the 12.5% quarterly commission as a regular, formula-driven component of Tim's earned compensation every year for more than a decade. Catalyst's own bonus-history records reflect commissions paid to Tim in each of the ten years from 2014 through 2023—$15,000 (2014), $40,000 (2015), $30,000 (2016), $55,000 (2017), $227,500 (2018), $209,400 (2019), $147,700 (2020), $64,000 (2021), $201,900 (2022), and $113,700 (2023), totaling $1,104,200—and a further $84,000 in 2024. In no year before 2024 did Catalyst

treat the commission as optional or invoke any "discretion" to decline to pay a commission the formula had generated.

10. In 2024, Catalyst paid Tim $84,000 in commissions, all on or before May 31, 2024, and paid him nothing further for the balance of the year.

11. The Amended Complaint admits that Catalyst's CEO "determined that Mr. Smith would not be receiving his discretionary phantom stock bonus" for "the last two fiscal quarters of 2024"—the third and fourth quarters (Dkt. 40 ¶ 53). Catalyst paid Tim no commission for either quarter, though Tim worked and Catalyst continued to operate throughout both.

12. The withheld quarterly commissions were earned compensation, not a gratuity: they were calculated by an objective formula from Catalyst's quarterly net income, paid as a matter of course for more than a decade, and subjected to accountant-administered true-ups.

13. The term sheet's only references to Arvin Talwar's "discretion" are narrow and prospective. Paragraph 4(a) commits to his discretion only the cap on an enhanced commission rate that would apply after a defined "Peg" net income was reached, and paragraph 8 provides that "[a]ll items are subject to change at the sole discretion of Arvin K. Talwar, CEO" Neither provision authorizes Catalyst to withhold a quarterly commission the 12.5% formula had already generated from actual net income for a quarter Tim had already worked.

14. In more than a decade of payments, Catalyst never once invoked paragraph 8 to withhold an earned commission.

15. Catalyst's asserted reason for withholding Tim's 2024 commissions—supposed "performance" deficiencies (Dkt. 40 ¶¶ 51–53)—appears nowhere in the term sheet, which conditions the commission solely on the objective measure of quarterly net income and not on any evaluation of Tim's performance (Catalyst0000061 ¶¶ 3–4).

46

16. The asserted performance rationale is a pretext for withholding compensation Tim had already earned.

17. The withholding did not follow from any term of Tim's compensation.

18. In late May 2024, Arvin Talwar decided that Catalyst would remain independent and that the contemplated sale—under which Tim stood to receive a recapitalization share of Catalyst's value—would not go forward (Dkt. 40 ¶¶ 25–26, 46).

19. Tim resigned on December 8, 2024, identifying among his reasons "the failed acquisition with Publicis Sapient, and the unexpected revocation of my phantom stock"—the same quarterly commission Catalyst labels "phantom stock" and admits it withheld (Dkt. 40 ¶¶ 25, 53).

20. Only after eliminating Tim's equity upside and receiving his resignation did Catalyst withhold the commissions Tim had earned on the company's fourth-quarter net income.

21. Catalyst cannot justify the withholding on the ground that 2024 was unprofitable. The commission is a fixed percentage of Catalyst's net income; by its own terms it is owed if and to the extent net income existed, and it yields nothing if net income did not.

22. To the extent Catalyst realized net income in the third and fourth quarters of 2024, Tim's 12.5% commission on that income was earned; Catalyst cannot retain the benefit of a profitable period while denying Tim the agreed formula share of it.

23. Catalyst in fact paid 2024 bonuses to its employees. The Amended Complaint alleges that Nicole Smith "received a bonus for her work in 2024" (Dkt. 40 ¶ 37), and Catalyst's payroll records reflect that payment (Catalyst0000973).

24. Catalyst paid 2024 bonuses to its staff generally. Tim—the Managing Principal and Chief Operating Officer, whose formula commission was the single largest component of his

47

compensation—was the one person Catalyst singled out to receive no commission for the second half of 2024.

25. Catalyst's refusal to pay was not a good-faith business judgment but an arbitrary and bad-faith act.

26. Catalyst invoked, for the first time in the parties' decade-long history, a "discretion" it had never used to deny an earned commission; it did so for a "performance" reason found nowhere in the objective net-income formula; it did so only after Tim resigned and after Arvin Talwar had personally eliminated Tim's equity upside; and it singled Tim out while paying 2024 bonuses to every other employee.

27. The withholding served no purpose connected to the compensation Tim had bargained for; its purpose and effect were to deprive Tim of benefits he had already earned and reasonably anticipated over more than a decade of formula payments.

28. Tim performed all of his obligations with respect to the compensation described above, and the amounts were earned before his separation.

## TIMELINESS OF THIS COUNTERCLAIM

29. This Counterclaim is asserted in Defendants' first responsive pleading to the operative Amended Complaint, which became due on July 16, 2026—fourteen days after the Court's July 2, 2026 Opinion and Order resolving Defendants' motion to dismiss (Dkt. 69)—under Federal Rule of Civil Procedure 12(a)(4)(A), and is therefore asserted as of right under Federal Rule of Civil Procedure 13.

30. No scheduling order in this action has set a deadline for amending the pleadings or joining parties. The case-management orders entered by the Court address discovery only. (Dkt. 22; Dkt. 58.)

48

31.     This Counterclaim responds directly to compensation allegations Catalyst placed in issue in the Amended Complaint, including its characterization of Tim's quarterly commission (Dkt. 40 ¶¶ 25–26) and its admission that it withheld that commission for the final two fiscal quarters of 2024 (Dkt. 40 ¶ 53).

32.     The facts underlying this Counterclaim rest principally on Catalyst's own payroll, bonus, and separation records—documents Catalyst has already collected, produced, and supplied to its retained damages expert—so its adjudication requires no material additional discovery and works no prejudice to any party.

## COUNT I — VIOLATION OF THE ILLINOIS WAGE PAYMENT AND COLLECTION ACT, 820 ILCS 115/1 et seq.

33.     Tim incorporates the foregoing paragraphs.

34.     At all relevant times, Catalyst was an "employer" and Tim was an "employee" within the meaning of the Illinois Wage Payment and Collection Act ("IWPCA"), 820 ILCS 115/1, /2.

35.     The withheld quarterly commissions for the third and fourth quarters of 2024 constitute "final compensation" owed at separation under 820 ILCS 115/2 and /5.

36.     Catalyst failed to pay Tim's final compensation when due and continues to withhold it.

37.     Arvin Talwar personally made the decision to withhold Tim's earned quarterly commissions (Dkt. 40 ¶ 53; Catalyst0000061 ¶ 8).

38.     Cindy Talwar administered and effectuated the disbursement of Tim's final compensation and knowingly permitted the underpayments. Each Individual Counter-Defendant is therefore personally liable as an "employer" under 820 ILCS 115/13.

49

39.     Under 820 ILCS 115/14, Tim is entitled to the underpaid amounts, statutory damages of 5% of the amount of the underpayments for each month the underpayments remain unpaid, and his costs and reasonable attorney's fees, against Catalyst and the Individual Counter-Defendants, jointly and severally.

### COUNT II — BREACH OF CONTRACT (IN THE ALTERNATIVE)

40.     Tim incorporates the foregoing paragraphs.

41.     Tim and Catalyst were parties to an agreement—evidenced by the 2019 compensation term sheet, Catalyst's handbook commitments, and the parties' course of dealing over more than a decade—under which Catalyst agreed to pay the 12.5% quarterly commission.

42.     That agreement included an implied duty of good faith and fair dealing. Because the term sheet vested Arvin Talwar with discretion touching Tim's compensation, Catalyst was obligated to exercise that discretion reasonably, with proper motive, and consistent with the parties' reasonable expectations. Catalyst breached that duty, and the agreement, by exercising the paragraph 8 discretion arbitrarily and in bad faith—as alleged above—to withhold a commission Tim had already earned on Catalyst's net income.

43.     To the extent that Arvin Talwar claims he had discretion to not pay an earned bonus at the end of a quarter that discretion had to be exercised in good faith.

44.     Arvin Talwar had no discretion to make payment after the work was completed and the bonus was earned.

45.     Tim performed. Catalyst breached the agreement by withholding the third- and fourth-quarter 2024 commissions.

46.     Tim has been damaged in an amount to be proven at trial, plus prejudgment interest.

**PRAYER FOR RELIEF**

WHEREFORE, Defendant/Counter-Plaintiff Timothy Smith respectfully requests that the Court enter judgment in his favor and against Catalyst Consulting Group, Inc. and, on Count I, against Arvin K. Talwar and Cindy Talwar, jointly and severally, and award: (a) all unpaid final compensation, including the withheld third- and fourth-quarter 2024 quarterly commissions, in an amount to be proven at trial; (b) statutory damages of 5% of the underpayments for each month they remain unpaid pursuant to 820 ILCS 115/14; (c) his costs and reasonable attorney's fees pursuant to 820 ILCS 115/14; (d) prejudgment and post-judgment interest as allowed by law; and (e) such other relief as the Court deems just and proper.

**JURY DEMAND**

Defendants demand trial by jury on all claims and counterclaims so triable.

Dated: July 13, 2026

Respectfully submitted,

TIMOTHY SMITH and NICOLE SMITH

By: /s/ *Alexander N. Loftus*

Alexander N. Loftus
LOFTUS & EISENBERG, LTD.
181 W. Madison Street, Suite 4700
Chicago, Illinois 60602
(312) 899-6625
alex@loftusandeisenberg.com
Counsel for Defendants/Counterclaimant

51

**CERTIFICATE OF SERVICE**

I hereby certify that on July 13, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Alexander N. Loftus